## VILLAGE OF ROSEVILLE v. ERNEST F. MARKHAM, d.b.a. MARKHAM EXCAVATING COMPANY.

127 N. W. (2d) 507.

April 3, 1964—No. 38,729.

518

*John E. Daubney* and *Thomas, King, Daubney, Swenson & Collatz*, for appellant.

*Willard L. Converse, Robert C. Bell,* and *Peterson, Bell & Converse,* for respondent.

FRANK T. GALLAGHER, C.

This appeal arises out of a complaint charging that on March 10, 1961, the defendant, Ernest F. Markham, d.b.a. Markham Excavating Company, willfully, wrongfully, and unlawfully used his land in Roseville for the storage and repairing of heavy construction equipment including bulldozers, trucks, and related equipment and for other open storage, all in violation of Village Code of Roseville, § 4.020. Defendant was found guilty in municipal court, and an appeal was taken to the district court where a jury found him guilty. This appeal is from an order of the district court denying his motion for judgment notwithstanding the verdict or a new trial.

The village admits the correctness, generally, of defendant's statement of facts, but sets out additional facts referred to hereinafter.

The defendant, age 68, is an excavating and grading contractor who resides with his wife and daughter at what is now the northeast corner of County Road B-2 and Lexington Avenue in the village of Roseville, Ramsey County, Minnesota. He has lived there since 1929 and has used the premises as his place of business since 1930.

According to defendant's testimony, when he first moved on the premises, he was employed as a milk wagon driver. Shortly thereafter he commenced doing some excavation work, digging basements with a team of horses. The horses and equipment used to do this work were kept on the premises. He originally purchased and occupied about 14 acres of land, rectangular in shape, about 183 feet wide and extend-

ing ½ mile to the east. The easterly portion of the property was gradually sold off for homesites, leaving defendant at the time of the trial some 4½ acres extending east from Lexington Avenue over 1,000 feet, most of which was being used as his home and for storage and repair of equipment. He became a full-time excavator in 1930, increased his work horses later to seven, and used wagons to transport his slip scrapers and plows to the job sites. He continued to pasture his horses and store his equipment on his premises. In 1933 he added a truck, and in 1939 he added a gasoline-operated shovel and a caterpillar tractor to his equipment. By that time he had also acquired three or four trucks and a four-wheeled trailer called a lowboy. He then had six men in his employ during the construction season together with his three sons when they were not in school. Prior to May 1942, two large caterpillar tractors were added to his equipment, which were kept on the job site until the following fall. By March 10, 1961, the date of the alleged violation, his equipment inventory had grown to three lowboys, four large earth-moving machines called turnapulls, about twenty caterpillar tractors, three rubber-tired tractors, twenty-five trucks of all types, two motor patrols or graders, and several pieces of specialized equipment called rollers, rooters, and tampers.

All of the equipment, according to defendant, was stored on the premises in the wintertime and most of it was on the job site in the summer except trucks, which were returned to the premises nightly if the job site was nearby. In the construction season, defendant employed as many as seventy men which dropped down to about three in the winter. He said that in March 1961 his equipment was stored in practically the same place on his premises as it had been in the winters of 1950 to 1953, and that in the 1940's the trucks, shovel, tractor, and lowboy were stored wherever they were left when they were driven onto the premises.

Defendant's testimony as to the usage of his premises and storage of his equipment there was substantially corroborated by his three sons, Wayne, Alfred, and Marvin, who were raised on the premises and grew up in the business.

Anthony Miller, a witness for defendant and a former employee, testi-

fied that he had worked for defendant from about 1935 until about 4 years prior to the trial. When he first went to work, defendant had a team of horses and later added other teams which pulled scrapers, plows, and wagons. This equipment when not in use was kept quite a distance from the house where they had a "kind of an orchard and a pasture." He thought defendant had some power equipment in December 1941 such as a shovel, a bulldozer, some trucks, and a trailer to move the equipment, also some horses in the pasture. He said that they parked the mechanical equipment "where they wanted to, in the whole area."

George Reiling sold defendant some trucks prior to May 1942 at which time the latter was digging basements and doing construction work with a shovel, caterpillar, dump trucks, "and the like." He said, "All the area out there looked like a farm in 1942."

The additional facts which the village considers necessary to submit are: That the first zoning regulation affecting the land in question came into being May 12, 1942, when Rose township adopted Ramsey County zoning plan; that since that time the property in question has been subject to zoning regulations; that at no time since May 12, 1942, has any zoning regulation been in effect which allowed or allows the present use of defendant's land; that all applicable zoning regulations contain provisions for the continuation of lawful nonconforming uses; and that the claim of nonconforming uses constituted the entire defense.

Neighbors and property owners living across County Road B-2 to the south of defendant's property also testified for the village. Mrs. Richard Johnson, 1030 West County Road B-2, said that she, her husband, and family lived there in a single-family dwelling for about 10 years; that she was familiar with the surrounding property as it appeared in May 1952; that when they bought their home at that time there was nothing but fields, bunches of trees, and tall grass "over here" (indicating defendant's property); that to the best of her knowledge the machine shed and garage were there, but not the office building; that no heavy equipment was stored at or near the premises in May 1952 as "it was empty fields"; that there was no loading ramp

there at that time; and that the first time she observed any heavy equipment on the property was in 1954. On cross-examination, Mrs. Johnson was asked if she made any inquiry as to the use of the defendant's property across the street. She answered that she did not ask what the various buildings were for in addition to the home; that she didn't observe a gasoline pump outside the building, but she thought there was a truck "down there." On redirect examination she was asked if she inquired about the zoning of the property in May 1952. She replied that she inquired as to the usage of the property.

"Q. What response did you have to your inquiry?

"A. We found that—

"Mr. Daubney [defendant's attorney]: We object on the grounds that constitutes hearsay evidence.

"Court: Overruled.

"A. We were told that this was a farm, or a farmer who had a farm, and the lots across the street were not being used but that they were going to be built on, and there was nothing growing over there, such as any kind of farm vegetables and anything of that sort, and the barns were supposed to have been the farmer's barns."

John Reed moved to 1024 West County Road B-2 in 1951. As he remembered it there were very few units in front of defendant's place across the street and they were parked in front of his buildings. In the area indicated on the plat as "heavy equipment parking area," there was nothing at all, "just high grass and weeds." He testified over defendant's objection that no one told him in 1951 when he moved in that the area marked "heavy equipment parking area" would be used for parking heavy construction equipment.

A general contractor called as a witness by the village said that in 1951 he had constructed some homes in the locality involved. At least one of them was directly across the street from the defendant's property. At that time he said defendant had some equipment mostly stored around the sheds, but the land across the street was "just a field."

Another witness for the village said that when he moved into his home in 1952 the defendant's property across the street was "just an open field," but on March 10, 1961, there was a loading ramp and

heavy equipment there, "it's more or less like a junk area." His wife testified that in 1952 defendant's property was "a big field, trees, grass; it was just a lovely big meadow," while on March 10, 1961, it appeared like "a junk yard. * * * big scraps of iron, and piles of gravel and dirt, and just logs, and old tires."

One witness for the village said that in May 1949 when he moved across the street from the area marked "heavy equipment parking area" on the defendant's property it was primarily a field covered with grass and a few isolated trees; that none of that area was used for parking heavy equipment at that time and there was no loading ramp. On March 10, 1961, the land was "completely covered with either equipment or equipment that is being broken down * * * sewer piping, and surplus mounds of discarded materials * * *." Another who lived there since August 1953 said that at that time the defendant's property directly across from her's was "vacant; open fields," while on March 10, 1961, there were "many trucks and heavy equipment, road patrols, broken down earth movers, and debris, litter."

Representatives of the Ramsey County Auditor and Ramsey County Assessor testified that defendant's personal property tax returns showed his construction equipment to have a true value of $2,505 in 1942, excluding licensed trucks which were not taxed as personal property. Until 1943 the assessor accepted the valuations placed on the property by the owner and only made visual inspections on May 1 each year when most of the equipment was on the job site. The witnesses showed a gradual increase in valuation from $2,505 in 1942 to $25,995 in 1952. It appears that in 1953 the assessor checked defendant's records for the first time and made an assessment of $150,000 which was the highest value until 1960, which was also set at $150,000. In 1961 the value was established at $102,450. These values were for contracting equipment which, according to the record, is machinery which does not convey a person or a product and excludes trucks.

It was stipulated at the trial that on May 12, 1942, the township of Rose adopted the Ramsey County Zoning Ordinance; that thereafter upon the incorporation of the village of Roseville in 1948 the ordinances of the township of Rose, including the zoning ordinance, were adopted;

that in 1959 the village of Roseville adopted a new zoning code and sub-division regulations. It was also stipulated and agreed that the above-described ordinances recite the applicable governing law and that the court might take judicial notice of the same.

At the time of the alleged offense, the premises were zoned R-1, or single-family residential. Previously when the township of Rose was incorporated as the village of Roseville in 1948, the land was classified as Farm Residential District A. It was stipulated that defendant does not contend that he comes within any of the permitted uses of the R-1 zone, but bases his defense upon the nonconforming use provisions of present and previous ordinances. He claims nonconforming use at or prior to the enactment of the zoning plan in Rose township in 1942.

The Ramsey County Zoning Ordinance, § 10, adopted by Roseville on May 12, 1942, defined nonconforming use as follows:

"A building or the use of land that does not conform with the use or other regulations provided in this resolution for the district in which it is situated."

Section 11 of that ordinance provides in part:

"(a) Except as otherwise provided in this Section, the lawful use of any land or building existing at the time of the adoption of this plan may be continued, although such use does not conform to the regulations specified by this plan for the district in which such land or building is located; provided, however, that no such non-conforming use of land shall be enlarged or increased, nor shall any such non-conforming use be extended to occupy a greater area of land than that occupied by such use at the time of the adoption of this plan; nor shall any such non-conforming use be moved to any other part of the parcel of land upon which the same was conducted at the time of the adoption of this plan * * *."

The Village Code of Roseville, § 4.020, which was part of the new zoning ordinance adopted in 1959, provides:

"Except as hereinafter provided, no building, structure or land shall

be occupied or used which is not in conformity with the regulations and terms herein specified."

The Village Code of Roseville, § 11.010, also adopted in 1959, provides:

"Any building, structure or use lawfully existing on May 21, 1959, may be continued at the size and in the manner of operation as existing upon said date, except as hereinafter specified. Nothing in this Code shall prevent the placing of a building or structure in safe condition when said building or structure is declared unsafe by the building inspector."

The trial court refused to read § 11.010 in its charge, although requested by defendant to do so. It charged the jury that under the applicable ordinance the defendant's use of his land on or about March 10, 1961, was unlawful and that—

"* * * the only issue which the law directs you to consider is: Was or was not the defendant's use of his land on or about March 10, 1961, a substantial enlargement or increase over his use thereof on May 12, 1942, or an extension of occupancy to a substantially greater area than that occupied by him for the use on May 12, 1942."

The defendant did not object to the charge before the jury retired. He did, however, assign the above instruction as error in his motion for judgment notwithstanding the verdict or a new trial. An error in the instructions with respect to fundamental law or controlling principles may be assigned in a motion for a new trial though it was not otherwise called to the attention of the court. Coble v. Lacey, 252 Minn. 423, 90 N. W. (2d) 314, and cases cited; Rule 51, Rules of Civil Procedure.[1]

---

[1]In State v. Wilson, 238 Minn. 447, 454, 57 N. W. (2d) 412, 416, this court said: "Our rule is now embodied in Rule 51 of the Rules of Civil Procedure. While these rules do not apply to criminal trials and this case was tried prior to the effective date of the new rules, Rule 51 states the law as it existed prior to its adoption. See, 2 Youngquist & Blacik, Minnesota Rules Practice, 555. Rule 51 of the Rules of Civil Procedure, as far as here material, reads:

" '* * * No party may assign as error unintentional misstatements and

It is our opinion that inasmuch as defendant was charged with a violation of § 4.020, the applicable law under the facts and circumstances here is the 1959 zoning ordinance. It follows that the question for the jury to determine was whether the defendant's use of his land on or about March 10, 1961, was a substantial enlargement or increase over his use on May 21, 1959, the date of the adoption of the new zoning code.

The village argues that defendant is attempting to establish that when Roseville passed the comprehensive zoning plan in 1959 all unlawful uses of land were somehow made lawful. We cannot agree with that argument. There is nothing in the record here to indicate that the defendant's use of his land was considered unlawful from May 12, 1942, until March 10, 1961, the date of the alleged violation of the 1959 code which was adopted almost 2 years before his arrest.

Although it is obvious here that the defendant's use of his land was intensified between May 12, 1942, and March 10, 1961, the record is not too satisfactory as to how substantial an enlargement or increased use, if any, took place between May 21, 1959, and March 10, 1961, the date of the alleged violation.

It is our opinion that because of the instructions given at the trial this case should be remanded for a new trial in accordance with this opinion.

Defendant claims error as to the admission of certain evidence objected to at the trial. In that connection, we believe it was error to permit Roswell B. Rehnke to testify over defendant's objections that the F.H.A. refused to insure a mortgage across the street from defendant's property on an application received March 22, 1961, some 12 days after the date of the alleged violation.

With reference to defendant's claim that the court erred in permit-

---

verbal errors, or omissions in the charge, unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objections. An error in the instructions with respect to fundamental law or controlling principle may be assigned in a motion for a new trial though it was not otherwise called to the attention of the court.' "

ting Mrs. Richard Johnson to testify over his objection that she had been informed in 1952 that defendant's property was a farm and was going to be developed into residential lots, it appears that defendant earlier opened this question when he asked the witness if she made any inquiries as to the use of his property when she purchased her home in 1952. Under those circumstances, admission of her testimony did not constitute reversible error.

We need not pass on other errors claimed by the defendant as to the admission of testimony as those matters will have to be determined by the trial court if and when they come up on the new trial.

Reversed and new trial granted.